IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 18-253 |
| ANMOL SINGH KAMRA | : | |

**MEMORANDUM**

**SURRICK, J.**                                                                                                   **MARCH 9, 2021**

After a ten-day jury trial, Defendant Anmol Singh Kamra was found guilty of conspiracy to distribute controlled substances, in violation of 21 U.S.C. § 846. Defendant worked at a pharmacy and processed fake oxycodone prescriptions for co-conspirators George Fisher, a medical doctor who wrote the scripts, and Frank Brown, who sold the oxycodone pills on the street. The Government alleged that Defendant filled prescriptions from Fisher knowing that they were not intended for a legitimate medical purpose. Defendant moves for a new trial under Federal Rule of Criminal Procedure 33. (ECF No. 122.) He contends that the jury's verdict was contrary to the weight of the evidence and that there is a serious danger that an innocent man has been convicted. For the following reasons, Defendant's Motion will be denied.

**I.    BACKGROUND**

On June 13, 2018, the Government filed an Indictment charging Defendant with conspiracy to distribute oxycodone, a Schedule II controlled substance, outside the usual course of professional practice and for no legitimate medical purpose, in violation of 21 U.S.C. § 846. The Government alleged that from December 2012 through about March 2016, Defendant, a pharmacist assistant at Campus Pharmacy in Philadelphia, conspired with George Fisher, a physician, and Frank Brown, to illegally distribute thousands of oxycodone pills to drug users.

(ECF No. 1.)  Pursuant to the scheme, Defendant would fill fake oxycodone prescriptions containing sham patient names.  The scripts were written by Fisher.  Defendant would give the oxycodone pills to Brown, who in turn sold the pills in street level drug deals.  (*Id*.)  Fisher and Brown were charged separately.  Both pleaded guilty to their involvement in the conspiracy and cooperated with the Government.

To establish Defendant's involvement in and knowledge of the conspiracy, the Government presented substantial evidence including:  the testimony of the two cooperating coconspirators, Fisher and Brown; the testimony of the FBI Agents who investigated the conspiracy; the testimony of individuals who unknowingly had oxycodone scripts filled in their name by Defendant; hundreds of documents showing fraudulent oxycodone scripts filled at Campus Pharmacy; video recordings of meetings between Defendant, Fisher, and Brown, during which they discussed backdating oxycodone scripts; and financial records and expert financial testimony about deposits Defendant made into bank accounts during the relevant time frame.

Defendant also presented evidence and testimony to support his defense of innocence. Defendant portrayed that he was unaware that the oxycodone scripts were fraudulent; that he believed Fisher had treated the patients named in the scripts; that he is a hard-working, law-abiding, pharmacy employee who was simply doing his job; and that part of his job was to defer to medically trained professionals such as Fisher regarding decisions about medications and filling of prescriptions.  To establish his defense, Defendant presented his own testimony; the testimony of character witnesses, including his family; a financial expert; and pharmacy business documents.

After ten days of evidence and testimony and two days of deliberations, the jury found Defendant guilty.  Before addressing Defendant's arguments for a new trial, we provide a

summary of the relevant facts deduced from the evidence admitted at trial.

Defendant is a Sikh Indian who moved to the United States to attend college. (Nov. 21, 2019 Tr. 193, ECF No. 112.) When he was 19 years old, Defendant met two pharmacists who were interested in starting a community pharmacy. (*Id*. at 233.) Defendant began working part time at Campus Pharmacy shortly after it opened in late 2012. (*Id*. at. 193.) Although he had no medical training, Defendant assisted with business and marketing. (*Id*. at 234-36.) His title was Marketing Executive, and his role was to grow the business through marketing and community outreach. (*Id*. at 243-44; Gov. Ex. 53.) Defendant did not become a full-time paid employee of Campus Pharmacy until early 2014, after he graduated from college. (Nov. 21 Tr. 254.)

Coconspirator George Fisher, a physician, opened a medical office in the same building as Campus Pharmacy in December 2012. (Nov. 14, 2019 Tr. 180, ECF No. 107.) After starting the practice, Fisher began writing fake prescriptions for oxycodone and giving them to Frank Brown, who would have them filled at Campus Pharmacy. (*Id*. at 183, 186-87.) Oxycodone is a Schedule II controlled substance. 21 U.S.C. § 812, 21 C.F.R. § 1308.12. Brown sold the pills on the street. (Nov. 15 Tr. 194.) Fisher wrote fake scripts for Brown every week. (Nov. 14 Tr. 189.) Brown would provide Fisher with the names of individuals to write on the script. (*Id*.) Fisher never treated the individuals whose names appeared on the fake scripts. (*Id*. at 190.) Brown paid Fisher $50 to $100 for each fake prescription that Fisher wrote. (Nov. 14 Tr. 189.)

At first, Brown had the fake prescriptions filled by a different pharmacist, Vinnie Tandon, at Campus Pharmacy. (Nov. 15, 2019 Tr. 189-90, ECF No. 108.) Eventually Brown worked exclusively with Defendant. (*Id*.) According to Brown, when Defendant sold him oxycodone pills, he placed all the pills in one unlabeled bottle. (Nov. 14 Tr. 193-94; Nov. 15 Tr. 26, 193-94; Nov. 18, 2019 Tr. 271, ECF No. 109.) That way, if Brown was ever caught,

3

the pills could not be traced back to Campus Pharmacy. (Nov. 15 Tr. 193-94.) During the duration of the conspiracy, 46 different individuals had fraudulent oxycodone prescriptions filled at Camus Pharmacy with Fisher as the prescribing physician. (Gov. Exs. 3-48.) Fisher wrote hundreds of fake oxycodone scripts, which resulted in over 82,000 oxycodone pills being sold to drug users. (Gov. Exs. 49B, 85.) Defendant asked Fisher to also write scripts for other non-narcotic medications like ibuprofen and muscle relaxers to avoid scrutiny for the Pharmacy's high number of narcotics transactions. (*Id*. at 198-99.)

Brown testified that he paid Defendant $500 for each phony script that Defendant filled. (Nov. 15 Tr. 193.) Each prescription cost anywhere from $130 to $360. (Nov. 19, 2019 Tr. 183-88, ECF No. 110; Gov. Exs. 85, 86.) The Government posits that Defendant pocketed the difference.

The FBI began investigating Fisher's fraudulent script writing and conducted a search of his office in November 2015. (Nov. 15 Tr. 67-68.) As a result, Fisher entered a plea of guilty and began cooperating with the Government. Part of his cooperation included video recording two meetings that took place between himself, Defendant, and Brown. (Nov. 14 Tr. 222-24.) The purpose of the meetings was for Fisher to write prescriptions for pills that Defendant had already sold to Brown. (Nov. 14 Tr. 193-99; Nov. 15 Tr. 219-35.) The first recorded meeting occurred on March 9, 2016. (Nov. 14 Tr. 223; Gov. Exs. 54, 54A.) During the meeting, Defendant and Brown tell Fisher what names and dates to put on oxycodone scripts. (Gov. Ex. 54A.) Fisher asks whether the scripts are for pills already dispensed and Defendant responds, "yeah." (*Id*.) The second recorded meeting occurred on March 14, 2016. (Gov. Ex. 55A.) At this meeting, Defendant, Brown, and Fisher again discuss backdating prescriptions to create a paper file for oxycodone pills that Defendant already sold to Brown. (*Id*.) Defendant is heard

telling Fisher what names and dates to write on scripts.  (*Id*.)

Shortly after these meetings, federal investigators executed a search warrant at Campus Pharmacy.  Defendant was present for the search and was helpful and cooperative with investigators.  (Nov. 13, 2019 Tr. 69, 74, ECF No. 106.)  Investigators seized thousands of fraudulent prescriptions for oxycodone and other documents relevant to the conspiracy.  (*Id*. at 174-75.)

## II.     LEGAL STANDARD

Federal Rule of Criminal Procedure 33 permits a court to vacate any judgment and grant a new trial "if the interest of justice so requires."  Fed. R. Crim. P. 33(a).  Kamra contends that the interest of justice requires a new trial because the jury's verdict is contrary to the weight of the evidence.  "A district court can order a new trial on the ground that the jury's verdict is contrary to the weight of evidence only if it 'believes that there is a serious danger that a miscarriage of justice has occurred—that is, that an innocent person has been convicted.'" *United States v. Johnson*, 302 F.3d 139, 150 (3d Cir. 2002) (quoting *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994)).  When evaluating a Rule 33 motion, the court "does not view the evidence favorably to the Government, but instead exercises its own judgment in assessing the Government's case."  *Id*.  Rule 33 motions "based on the weight of the evidence are not favored.  Such motions are to be granted sparingly and only in exceptional cases."  *United States v. Brennan*, 326 F.3d 176, 189 (3d Cir. 2003) (citation and internal quotation marks omitted).

## III.    DISCUSSION

Defendant challenges the sufficiency of the Government's evidence supporting his conviction for conspiracy to distribute oxycodone outside the usual course of professional practice and for no legitimate medical purpose.  To establish a conspiracy in violation of 21

U.S.C. § 846, the Government must prove:  (1) that two or more persons agreed to unlawfully distribute a controlled substance outside the usual course of professional practice and for no legitimate medical purpose.; (2) that Defendant was a party to or member of that agreement; and (3) that Defendant joined the agreement or conspiracy knowing of its objectives to unlawfully distribute a controlled substance outside the usual course of professional practice and for no legitimate medical purpose, and intending to join together with at least one other alleged conspirator to achieve that objective.  21 U.S.C. §§ 841(a)(1), 846, 821; 21 C.F.R. § 1306.04; Third Circuit Model Criminal Jury Instructions § 6.21.846B.

Defendant does not contest the first element—the existence of conspiracy.  Instead, he states that he was simply not a member of it:  that he was unaware that Fisher's prescriptions were illegitimate and that the patient names on the scripts were shams.  According to Defendant, he was simply doing his job as a pharmacy assistant and deferred to the instructions of the medically trained professionals.  To support his position that the jury's verdict was contrary to the weight of the evidence, Defendant raises two overarching arguments:  (1) the Government's three main categories of evidence—cooperating witness testimony, video and audio recordings, and bank records showing cash deposits into Defendant's accounts—were all discredited at the trial and thus unreliable; and (2) there was significant evidence supporting a lack of criminal intent on the part of Defendant.

### A. Government's Evidence

#### 1. *Cooperating Witness Testimony*

Defendant first contends that the Government's two cooperating witnesses—George Fisher and Frank Brown—were biased and not credible.  With regard to Fisher, Defendant highlights the fact that under his plea agreement, Fisher was facing significant time:  a maximum

possible sentence of 440 years and a possible guideline range of nine to eleven years' imprisonment. Based on this, Fisher was motivated to help law enforcement prosecute Defendant because by doing so he could lower his sentence. Defendant also argues that Fisher's testimony is unreliable because it contained inconsistencies and was contradicted by other evidence in the record. With regard to Brown, Defendant contends that his testimony was inherently unreliable. Brown had a history of abusing pain pills that could have impaired his memory. Brown's former girlfriend, Kara Reavis, testified that Brown was not a truthful person. (Nov. 19 Tr. 77.) Similar to Fisher, Brown was motivated to cooperate with the prosecution because he was facing a maximum of a 160-year prison sentence for these charges and a federal parole violation. (Nov. 18 Tr. 59, 71.)

The testimony of these two cooperating witnesses was significant to the Government's case. They both testified that Defendant knew Fisher was not treating the patients named on the oxycodone prescriptions and that he knew that the pills were not dispensed for a legitimate medical purpose. In addition, Brown testified that Defendant had a financial incentive in the scheme—he received $500 for each script he filled.

Defendant's challenges to Fisher and Brown's credibility and motives are unavailing for two reasons. First, as the Third Circuit has noted, when a jury has heard evidence about a witness' motivations, potential biases, or inconsistencies, it is their responsibility—not the Court's—to decide whether or not to believe the witness' testimony. *United States v. Salahuddin*, 765 F.3d 329, 346 (3d Cir. 2014). The jury heard the details about Brown and Fisher's guilty plea agreements. The jury heard defense counsel's opening and closing statements and its cross-examination of Brown and Fisher—all of which highlighted biases, motivations, and inconsistencies of the witnesses. Defendant had two highly competent

attorneys who were assiduous in poking holes in the credibility of these two important Government witnesses. The jury also heard the Court's instructions that cooperating witness plea agreements could be considered in assessing witness credibility, but not guilt. (Nov. 25, 2019 Tr. 99-100, ECF No. 114.) The jury was made aware of Fisher and Brown's motivations, potential biases, and inconsistencies. The jury nevertheless found Defendant guilty. Under these circumstances, it is not the Court's role to interfere with the jury's assessment of credibility. *See Salahuddin*, 765 F.3d at 346; *see also United States v. Robinson*, 430 F.3d 537, 543 (2d Cir. 2005) (finding that, in the context of a motion for a new trial, "the court may not wholly usurp the jury's role. It is only where exceptional circumstances can be demonstrated that the trial judge may intrude upon the jury function of credibility assessment" (internal quotation marks omitted)).

Second, Fisher and Brown's testimony was corroborated by other evidence in the record. For example, the Government presented the testimony of four witnesses—David Travers, Kara Reavis, Wyseenia Williams, and Curtis Simmons—whose names were used on the fraudulent oxycodone scripts filled at Campus Pharmacy. Each testified that they never received the medications dispensed in their name. (Nov. 19 Tr. 7-22, 40-50, 56-71, 103-118.) Two of these witnesses—Reavis and Williams—also had legitimate scripts filled by Defendant at Campus Pharmacy. (Nov. 19 Tr. 70, 105-06.) When they picked up the legitimate medications, Defendant never mentioned anything about the oxycodone prescriptions that were being filled in their names and provided to Brown. (*Id*.) Once Williams tried to have a legitimate script filled for pain killers at Campus Pharmacy, but Defendant said it could not be filled because the script was lacking certain required information. (*Id*. at 108-09.) Again, Defendant never brought up the numerous other oxycodone scripts written by Fisher that were being filled in her name. (*Id*.

at 110-18; Gov. Ex. 12.)  The fact that Defendant never mentioned the oxycodone prescriptions to Reavis and Williams is significant.  It corroborates Fisher and Brown's testimony that Defendant knew that the oxycodone pills were not intended for legitimate medical purpose and that the patients named on the oxycodone scripts were not being treated by Fisher.

Kara Reavis also testified that she never had ibuprofen filled at Campus Pharmacy; however, on four occasions, prescriptions for ibuprofen were filled in her name.  (Nov. 19 Tr. 69; Gov Ex. 98.)  This corroborated Fisher's testimony that Defendant requested that he write scripts for non-narcotic medications like ibuprofen to hide the large number of oxycodone prescriptions being filled at Campus Pharmacy and avoid scrutiny or possible audit.

The testimony of Fisher and Brown was also corroborated by what the Court considers the most damaging evidence against Defendant in this case—the video recordings from his meetings with Fisher and Brown on March 9 and March 14, 2016.

### 2. *Video Recordings of March 2016 Meetings*

The Government presented two video recordings of meetings held at Campus Pharmacy between Defendant, Fisher, and Brown.  The meetings were recorded by Fisher as part of his cooperation with the Government.  During the March 9 video, the three men can be seen discussing Fisher writing oxycodone scripts for pills that had "already been given out." (Gov. Exs. 54, 54A.)  In the video, Brown and Defendant tell Fisher the names, quantities, and dates to "use" on the script:

> Fisher:      Which ones? Um . . . Natasha Simmons, Angela Cox, Zahir Robinson, Carmetta Pittman, Latiff Gray, Curtis Simmons, and they . . . and these are the dates . . . what are the dates that I need to put down?
>
> Defendant:   Any dates.
>
> Brown:       Yeah.

9

  Fisher:   It can't be today, it has to be in February, right?

  Defendant:  No, no, no.  In February.

(*Id*.)

Later in video, Defendant requests backdated scripts for Endocet, which is the brand name version of oxycodone:

  Defendant:  And for the Endocet?

  Fisher:   For who?

  Defendant:  10/235s. I need two prescriptions on those.

  Fisher:   Who's the patient's name?

  Defendant:  You wanna use . . . Wyseenia Williams and Jonah Brown?

(*Id*.)

Similarly, during the March 14, 2016 video, Defendant is seen directing Fisher to write backdated prescriptions.  He again offers the names and dates to be used on the scripts:

  Fisher:   Uh, the numbers are off?

  Defendant:  One thirty two, give me one more for 120.

  Fisher:   Who's that?

  Defendant:  Just use one of the names.

  Fisher:   What name do you want me to use?  Doreen Brown?  Atiya Caldwell?

  Defendant:  Use, uh, David Travers.

  Fisher:   uh, the 24th?

  Defendant:  uh.  Yep.

  Fisher:   for one-twenty?

  Defendant:  Yes sir.

(Gov. Exs. 55, 55A.)

Defendant is also heard explaining the importance of maintaining scripts for pills that were already sold—to "have things on track" in case of an audit. Defendant confesses that he does not want to "forget anything that will hurt [him] or [Fisher]." (*Id.*)

Defendant contends that the videos simply show him doing his job and deferring to Fisher's guidance as the medically trained professional. Defendant claims that selling oxycodone pills to Brown before Fisher provided the scripts was a professional courtesy that the pharmacy extended to Fisher and not evidence of his involvement in the conspiracy. Defendant contends he still believed the pills would ultimately go to the named individual on the script. Defendant's own statements in the recorded March 2016 meetings contradict this. Defendant is heard directing the names, quantities, and dates to be included in the scripts. This reveals that Defendant knew the scripts were fake and that the pills were not intended for legitimate medical purposes. Defendant is unable to reconcile his owns statements in these recordings with his claim that he believed the oxycodone pills were ultimately delivered to patients of Fisher whose names appeared on the script. The video recordings are strong evidence that corroborates the testimony of Fisher and Brown.

### 3. *Evidence of Cash Deposits*

Finally, Defendant attempts to discredit the Government's financial evidence. The Government presented Defendant's bank records and the testimony of a financial analyst to demonstrate that Defendant had a financial incentive to be involved in the conspiracy. The financial analyst testified that Defendant deposited approximately $275,000 of cash into his various bank accounts from January 1, 2013 through April 6, 2017. (Nov. 19 Tr. 141-161; Gov. Exs. 78, 78C, 78D.) This was in addition to the salary he received from Campus Pharmacy by

way of direct deposit. (Gov. Exs. 78, 78E.) Brown testified that Defendant received $500 for every script filled. This was more than the legitimate cost of the medication, which ranged from $130 to $360 per prescription. The circumstantial evidence presented by the Government supports the assumption that Defendant pocketed the difference.

Defendant explained to the jury that the large amounts of cash he deposited into his bank account did not derive from the criminal conspiracy but instead came from his family, who brought cash with them when visiting Defendant from India. (Nov. 21 Tr. 220.) Defendant's family brought cash to provide financial support to Defendant and to avoid steep transfer fees incurred from wiring money. (*Id*. at 226-27.) Defendant testified that he was raised to use cash for transactions and kept his cash in a safe. (*Id*. at 220, 225.) He deposited cash into his bank accounts when he needed to pay his credit card and other bills. (Nov. 22, 2019 Tr. 16, ECF No. 113.)

Defendant's explanation for the large amount of cash deposits he made during the conspiracy simply does not add up. The evidentiary record reflects that family trips to the United States were made in 2013 (Defendant's parents, sister, and brother); 2014 (Defendant's parents, grandparents, brother, sister, and uncle); and in 2015 (Defendant's sister). (Nov. 20 Tr. 14-26, 161-64.) Each family member brought approximately $9,000 for Defendant during each visit. (*Id*.) Defendant also brought cash back to the United States after visits to India in 2011, 2013, and 2015. (Nov. 21 Tr. 222-23.) He brought approximately $7,000 to $8,000 back after each trip. Adding all these cash payments together does not account for even half of the amount of cash deposits that were made by Defendant into his bank accounts during the course of the conspiracy. The Government's circumstantial evidence of Defendant's financial incentive was not discredited.

### B. Criminal Intent

Finally, Defendant argues that evidence he presented during the trial proves that he lacked the criminal intent to be part of a drug trafficking conspiracy. Defendant points to five general categories of evidence to support his argument that he lacked criminal intent. First, he contends that his demeanor on the day investigators searched Campus Pharmacy—where he was cooperative and helpful—is incongruent with someone guilty of drug trafficking. Second, he argues that the Campus Pharmacy records, which show that Defendant grew the overall business at Campus pharmacy while Schedule II prescriptions decreased, reveal that he was simply doing his job and doing it well. Third, Defendant contends that the evidence supports his belief that Fisher was a legitimate doctor, that Brown was authorized to pick up scripts for Fisher, and that patient prescription histories served to verify the validity of the oxycodone scripts. Fourth, Defendant claims that his willingness to testify and subject himself to cross-examination supports his innocence. Finally, Defendant points to the numerous character witnesses that testified on his behalf.

As part of its burden of proof, the Government had to demonstrate that Defendant "knew of the agreement and intended both to join it and to accomplish its illegal objects." *United States v. McKee*, 506 F.3d 225, 241 (3rd Cir. 2007); *see also United States v. Korey*, 472 F.3d 89, 93 (3d Cir. 2007) (stating in a case involving conspiracy to distribute controlled substances under 18 U.S.C. § 846, that "[o]ne of the requisite elements the government must show in a conspiracy case is that the alleged conspirators shared a 'unity of purpose,' the intent to achieve a common goal, and an agreement to work together toward the goal") (citation omitted).

Defendant presented extensive evidence to support his defense that he lacked the knowledge and intent to be involved in an oxycodone trafficking conspiracy. The character

evidence testimony alone was substantial and included praise from community members, friends, family, coworkers, a police officer, and a high-ranking administrator from the Lebow College of Business at Drexel University, where Defendant was an alumnus. However, seemingly good people can still commit criminal acts. What Defendant was unable to do during the trial and is unable to do now is reconcile his claims of innocence with the March 2016 video recordings. Defendant is seen and heard directing Fisher—the same medically trained professional he claims to defer to regarding decisions about medications and prescriptions—to write the names, quantities, and dates on narcotics scripts. Names are picked at random. The actual pills contemplated in the scripts had already been dispensed to Brown by Defendant. Defendant's conduct simply does not align with an individual who innocently believed the prescriptions were legitimate or the patients listed on them were actually receiving the pills they were purportedly prescribed. Defendant's very words and actions during the March 2016 meetings reveal his knowledge of the agreement and intent to accomplish the conspiracy's illegal objective.

In compliance with our responsibility to exercise our own judgment in assessing the Government's case, we again reviewed all the evidence and testimony from Defendant's trial. The evidence and testimony supported the jury's finding of guilt. The Court, like the jury, had the opportunity to observe the witnesses and evidence firsthand. Based upon our review of the totality of the evidence, we are convinced that the jury's verdict was not contrary to the weight of the evidence. This is not an "exceptional case" that warrants reversal of the jury's verdict.

## IV.  CONCLUSION

For the foregoing reasons, the interest of justice does not require us to grant Defendant a new trial.  Accordingly, Defendant's Motion for a New Trial will be denied.

An appropriate order follows.

**BY THE COURT:**

*/s/ R. Barclay Surrick*
**R. BARCLAY SURRICK, J.**
